Argued November 30, affirmed March 5, reconsideration
denied May 8, petition for review denied May 30, 1979,
286 Or 44

STATE OF OREGON, *Respondent,*
*v.*
LAWRENCE EDWARD ATTEBERY,
*Appellant.*
(No. C77-03-03428, CA 8789)

591 P2d 409

[141]

James E. Mountain, Jr., Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

W. Benny Won, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, and Johnson,* Gillette, and Roberts, Judges.

GILLETTE, J.

---

*Johnson, J., resigned December 18, 1978.

## GILLETTE, J.

Defendant appeals his conviction after trial by jury for murder,[1] assigning three separate alleged errors. We affirm.

The death in this case occurred as the result of the victim of a March 19, 1976, pharmacy robbery being struck on the head during the robbery. He died several months later.

Defendant's first assignment of error concerns the trial court's admission into evidence of an incriminating statement made by defendant to the police after he had been indicted for murder, was in custody, and had appointed counsel representing him. The statement must be viewed in the context of an extended chronology of discussion by defendant with the police:

On at least seven occasions over the year following the robbery, the defendant was questioned by the police. On most of those occasions, defendant was in jail on other charges. The first of these conversations was on March 30, 1976, at the Portland Police Bureau Detective Division where, after being advised of his rights, the defendant indicated his desire to remain silent. On April 2, 1976, the defendant called Detective Cosby from Rocky Butte Jail and said he wanted to "clear up his involvement" in another robbery. He denied involvement in the pharmacy robbery after being advised of his rights. On April 5th, the defendant called Cosby saying he had information about the robbery. After having been advised of his rights, he denied involvement but claimed to know who one of the perpetrators was and how the robbery was committed. On May 25, 1976, the defendant was picked up at Rocky Butte and taken downtown for a polygraph test. He again was advised of his rights and denied involvement in the pharmacy robbery. After taking

---

[1] Defendant was also charged in the two-count indictment with Robbery in the First Degree. Prior to trial, the robbery charge was severed. *See* the discussion of defendant's third assignment of error, *infra.*

the polygraph examination he named two persons as having committed the crime.

On December 22, 1976, the defendant was questioned by detectives at the Oregon State Penitentiary, where he was serving a sentence for another robbery. He was advised of his rights but he refused to sign the advice of rights form. The police told the defendant what evidence they had against him and that he would be indicted. The defendant refused to talk about the case other than to say, "The only thing I am going to tell you is I have an alibi."

Defendant was indicted for robbery and felony murder on March 11, 1977. On March 14, 1977, the detectives again talked to defendant when they went to Oregon State Penitentiary to serve him with an arrest warrant for the robbery and murder. The defendant again refused to sign the advice of rights form and made no statements to the detectives.

On March 18, 1977, defense counsel was notified of his appointment to represent the defendant in the case. Defendant was brought to Rocky Butte Jail. On March 28, 1977, he called Detective Cosby and said he wanted to talk about the pharmacy robbery. Detective Cosby testified that he went to Rocky Butte on March 29, 1977, to talk to the defendant. He did not readvise defendant of his rights. According to the detective, the defendant said he wanted to say something about the pharmacy robbery and he would like anything he said to be off the record. The defendant then admitted involvement in the robbery as the driver of the getaway car. The detective then told the defendant to stop talking because the defendant had not told his attorney that he was going to talk to the police.

Detective Cosby admitted that no record whatsoever was made of this March 29th meeting because the defendant had asked that it be off the record. Cosby also admitted that he knew that the defendant had counsel at the time of this interview. He said he

told the defendant that defense counsel would have to be contacted before a taped statement could be taken.

At the *Miranda* hearing, the defendant testified that on all the occasions when he was questioned he was advised of his rights except for the March 29, 1977, interview. He also indicated that during the December 22 meeting, the officers told him that they knew he did not have to say anything, but that he was going to sit there and listen while they told him what occurred during the robbery. The defendant also testified that he was a heroin addict and that he had tried to make deals with the detectives so he could see his wife and therefore get drugs. The defendant admitted that he knew that any statements he made to police could be used against him and that he had been advised by his attorney on March 19, 1977, to make no statements to the police. The defendant, however, denied making any admissions of involvement in the robbery and murder during the March 29 interview.

At the conclusion of the hearing, the court overruled defense objections to evidence of the March 29, 1977, admission. Noting that defendant was "con wise" and had specifically admitted that he knew that what he had told the detective could be used against him, the trial court found that defendant's March 29, 1977 statement was voluntary.

■■ The fact that a defendant has counsel will not in itself prevent his giving voluntary statement without counsel being notified or present. *State v. Johnson,* 37 Or App 209, 586 P2d 811 (1978);*State v. Turner,* 32 Or App 61, 573 P2d 326 (1978). *See also Brewer v. Williams,* 430 US 387, 405-406, 97 S Ct 1232, 51 L Ed 2d 424 (1977). We have said that the state's burden of proving voluntary waiver of counsel in such cases is a heavy one. *State v. Johnson, supra,* 37 Or App at 214. The burden was met in this case. Defendant acknowledged that he knew the consequences of making a statement. His claim was that he *never made* such a statement. The trial court disbelieved him. We are

[145]

bound by the trial court's finding on this pivotal question. *State v. Warner,* 284 Or 147, 585 P2d 681 (1978). Defendant's incriminating statement was properly admitted.[2]

Defendant next assigns as error the trial court's denial of his motion for mistrial in connection with the prosecution's comment, during closing argument, on the defendant's failure during custodial interrogation on December 22, 1976, to give to police details of his alleged alibi.

At trial, defendant elicited testimony to the effect that he had told investigating officers that he had an alibi for the night of the robbery. The prosecution then elicited testimony from one of the officers that defendant did not give any details of the alibi.

During closing argument, the prosecutor told the jury,

"It was in December, shortly after [the victim's] death that the defendant panics and he tells the police that he has an alibi defense on December 22 but he doesn't provide any details, and why not? Because he doesn't have any at that the time."

Defendant's counsel moved for a mistrial, which was denied.

---

[2] Defendant argues that we should impose a rule of prophylaxis in these cases under Article I, § 11 of the Oregon Constitution, which provides:

"In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury in the county in which the offense shall have been committed; to be heard by himself and counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor; provided, however, that any accused person, in other than capital cases, and with the consent of the trial judge, may elect to waive trial by jury and consent to be tried by the judge of the court alone, such election to be in writing; provided, however, that in the circuit court ten members of the jury may render a verdict of guilty or not guilty, save and except a verdict of guilty of first degree murder, which shall be found only by a unanimous verdict, and not otherwise * * * *"

We decline to do so. We perceive no basis for creating a separate standard to be used in Oregon. *See State v. Flores,* 280 Or 273, 279-280, 570 P2d 965 (1977); *State v. Florance,* 270 Or 169, 182, 527 P2d 1202 (1974).

■ We agree with the trial judge, who ruled that the prosecutor's argument was fair comment. Defendant interjected the alibi issue into the case, attempting to imply that he had always had evidence that he was somewhere else on the night in question and the police were aware that he made such a claim. The further inference to be drawn was that defendant was an innocent man being hounded by the police. A defendant may raise such inferences if he wishes, but he cannot complain if the prosecution meets those inferences with evidence and with argument which cast the facts in another, less appealing, light. *State v. Rowley,* 6 Or App 13, 18-19, 485 P2d 1120, *rev den* (1971).

Defendant relies on *Doyle v. Ohio,* 426 US 610, 96 S Ct 2240, 49 L Ed 2d 91 (1976), where it was held that the prosecution may not use an accused's silence following *Miranda* warnings for impeachment purposes. *Doyle,* however, was a case of refusal to talk, *i.e.,* a case of the exercise of a constitutional privilege. This is a case of talking—claiming an alibi—and then trying to influence the jury by showing the claim was made while at the same time hiding from the jury facts surrounding the making of the claim which suggest it was false. We decline to turn *Doyle's* shield into a sword.

In his third assignment of error, defendant argues that the trial court erred in denying his motion for mistrial based upon a comment by the prosecutor during closing argument as to defendant's request for an instruction on the offense of Robbery in the First Degree:

"[MR. RAY]: * * * * * Ladies and gentlemen, you will have with you in the juryroom three verdict forms. Judge Jones has instructed you on this already. Murder, Robbery I and not guilty. The difference between Murder and Robbery I being the cause of death. Why do you suppose Mr. Walsh requested the Robbery I instruction.

"MR. WALSH: Objection.
"THE COURT: Yes.

[147]

"MR. WALSH: Your Honor, it is my understanding

"THE COURT: It was a definite request.

"MR. RAY: Do you suppose it is because, again, he doesn't really believe his alibi witness or his alibi defense is there? Do you suppose it is not there and he recognizes the fact? What he is trying to do, ladies and gentlemen, despite the evidence is to get you to arrive at a compromise verdict, Robbery in the First Degree. It is asking for these two verdict forms, and it is up to you to decide. Robbery I is a cop out, and there is no reason for you, as hardworking jurors, to compromise in this case because it is either Murder or not guilty.

"* * * * *."

(Tr 587-588)

"MR. WALSH: Your Honor, two objections. One, that the prosecutor made the statement we requested the lesser included when, in fact, that is a matter of law;* * * *"

While denying defendant's motion for a mistrial, the trial court also instructed the jury as follows:

"* * * There was some mention during argument about who requested what. That is immaterial. That is a matter of law and whatever I submitted to you is correct irrespective of who submitted certain instructions. In fact, we have quite a few requested by both sides, and that is a matter of law for the court. What is important is what you have received* * * *"

Here, defendant's objection went only to the prosecutor's comment as to who had requested the instruction. Assuming—without deciding—that such a comment would have been so improper as to constitute reversible error if uncorrected, we are satisfied that the trial court's curative instruction here was adequate.[3]

---

[3] In ruling as we do here, we wish to note that the trial court's decision to give any instruction at all concerning robbery is hard to understand. Prior to trial, defendant had moved to sever the robbery and murder charges, and they were severed. *See, e.g., State v. Bishop,* 16 Or App 310, 518 P2d 177 (1974). Defendant had therefore waived his right to have the issue considered by the jury in his murder trial, and the lesser included offense considerations of *State v. Washington,* 273 Or 829, 543 P2d 1058 (1975) would not apply.

Even had the comment been error and the trial judge's instruction insufficient to cure it, the result would be the same because, in view of the evidence, any such error would have been harmless. *See State v. Van Hooser,* 266 Or 19, 511 P2d 359 (1973).

1. Detective Cosby testified that defendant confessed to his involvement in the robbery in a March 29, 1977, interview with Detectives Cosby and Bladeow (the confession involved in assignment of error number one).

2. The sawed-off shotgun used in the robbery and tentatively identified by pharmacy employees was positively identified by defendant's acquaintances and was seen in defendant's possession the morning after the robbery, when he is said to have called the gun "his baby." Traces of blood were found on the butt of the gun. A doctor testified that the victim's head injuries were consistent with being struck by that part of the gun.

3. The gun owned by the victim was also seen in defendant's possession, and defendant, after selling the gun to one Leonard Tharp, made strenuous efforts to get the gun back or have it destroyed because it was "hot."

4. There was testimony that drugs stolen from the pharmacy in the robbery were seen in defendant's house the morning following the robbery.

5. There was testimony by three witnesses that defendant had asked each of them to participate in the robbery. One of those witnesses also testified that, shortly before the robbery, he and defendant "cased" the pharmacy looking for a good escape route. Another testified that months before the robbery he had suggested the pharmacy in question to defendant as a good target.

6. There was testimony that defendant admitted that he had hit the victim with the sawed-off shotgun.

[149]

There was also testimony that the morning after the robbery defendant was very pleased that the disguises the robbers used had worked so well, since the newspapers had inaccurate descriptions of the robbers.

7. Defendant, in his capacity as an "informant," at various times revealed intimate details of the robbery inconsistent with lack of involvement. One of these details told to Cosby and unnoticed by any witnesses, was that the victim also clicked off a round from his gun. The gun apparently misfired, however. There was testimony from a witness who had bought the gun that when he cleaned it he found a cartridge in the barrel.

8. There was testimony that the robber matching defendant's build wore a blonde wig at the robbery. One of defendant's acquaintances testified that he had seen defendant with a blonde wig.

Affirmed.